IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., | ) | 4:05CV3260 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| vs. | ) | |
| | ) | |
| NEBRASKA PUBLIC SERVICE COMMISSION, Utilities Division, Department of Commerce; FRANK E. LANDIS, JR., in his official capacity as a Member of the Nebraska Public Service Commission; ANNE C. BOYLE, in her official capacity as a Member of the Nebraska Public Service Commission; LOWELL C. JOHNSON, in his official capacity as a Member of the Nebraska Public Service Commission; ROD JOHNSON, in his official capacity as a Member of the Nebraska Public Service Commission; GERALD L. VAP, in his official capacity as Chairman and Member of the Nebraska Public Service Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOUTHEAST NEBRASKA TELEPHONE COMPANY, | ) ) | |
| | ) | |
| Defendant/Intervenor. | ) | |

Sprint Communications Company L.P. ("Sprint") seeks judicial review of an order that was entered by the Nebraska Public Service Commission ("NPSC") on September 13, 2005, in arbitration of a dispute between Sprint and the Southeast Nebraska Telephone Company ("SENTCO").  At issue in this appeal is SENTCO's obligation under section 251 of the Telecommunications Act of 1996, 47 U.S.C. § 251, to interconnect with Sprint for the purpose of enabling a third party, Time Warner Cable Inc. ("TWC"), to provide telephone service to residents of Falls City, Nebraska, in direct competition with SENTCO.

Upon *de novo* review conducted pursuant to 47 U.S.C. § 252(e)(6), I find that the NPSC's order is contrary to federal law insofar as the state commission held: (1) that Sprint, as a wholesale telecommunications carrier, was not the proper party to request the interconnection with SENTCO under 47 U.S.C. § 251(a); (2) that Sprint would not be acting as a "telecommunications carrier" [1] for purposes of 47 U.S.C. § 251(a) when performing a private contract with TWC; and (3) that Sprint cannot contract for reciprocal compensation under section 251(b)(5) for calls placed to or from TWC's retail customers.  Because of these three errors of law,[2] the NPSC's order will be reversed and the case will be remanded to the NPSC with directions to provide for the implementation of an interconnection agreement between Sprint and

---

[1]   The term "telecommunications carrier" means "any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 253 of [the Act]."  47 U.S.C.A. § 153(44) (West 2001).   "Telecommunications service" means "the offering of telecommunications for a fee directly to the public, or to such class of users as to be effectively available to the public, regardless of the facilities used."  47 U.S.C.A. § 153(46) (West 2001).   The term "telecommunications" means " the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information sent and received."  47 U.S.C.A. § 153(43) (West 2001).

[2] I do not review the correctness of any factual findings made by the NPSC.

-2-

SENTCO that will define the terms "end user" (or "end use customer") and "reciprocal compensation" in the manner that was proposed by Sprint.

## I.  BACKGROUND

The Telecommunications Act of 1996, 47 U.S.C. §§ 151-615b, "fundamentally restructured local telephone markets and the regulatory scheme that governed them" by requiring "local exchange carriers to facilitate local competition by sharing their networks with their new competitors." *Iowa Network Services, Inc. v. Qwest Corp.,* 363 F.3d 683, 685-686 (8th Cir. 2004).  Section 251(a) of the Act provides that each telecommunications carrier has a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers[.]" 47 U.S.C.A. § 251(a) (West 2001).  A local exchange carrier, such as SENTCO, also has a duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C.A. § 251(b)(5) (West 2001).

"Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of [the Act], an incumbent local exchange carrier[3] may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 . . .."  47 U.S.C.A. § 252(a)(1) (West 2001).  Under the Act, in other words, "phone companies are supposed to reach interconnection agreements to determine the charges and amounts paid amongst themselves for local phone calls. *Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Bd.*, 476 F.3d 572, 574 (8th Cir. 2007).

---

[3]An incumbent local exchange carrier ("ILEC") is the local exchange carrier that was in existence and providing local exchange service to a given area on the effective date of the Act, February 8, 1996.  *See* 47 U.S.C. § 251(h).

However, if the parties' negotiations fail, the Act authorizes the State public utility commission to conduct binding arbitration: "During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation . . ., the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C.A. § 252(b)(1) (West 2001). The State commission is directed to resolve open issues in a way that meets the requirements of section 251 and regulations prescribed by the Federal Communications Commission [FCC], to establish rates according to the standards set forth in section 252(d), and to provide a schedule for implementing the agreement reached during arbitration. *See* 47 U.S.C. § 252(c).

In the present case, SENTCO received Sprint's request to negotiate on December 16, 2004, and Sprint petitioned the NPSC for arbitration on May 23, 2005. Sprint identified two open issues, involving proposed definitions for "end user" (or "end use customer") and "reciprocal compensation" as used in the interconnection agreement, but both issues basically concerned the question whether third-parties contracting with Sprint would gain access to SENTCO's facilities and equipment. The NPSC ruled in favor of SENTCO by determining that Sprint could only use the agreement to provide service to its own retail customers in SENTCO's local exchange area. Pertinent excerpts from the NPSC's arbitration order are set forth below:

### A. NPSC Arbitration Order

I. BACKGROUND

    1. Petitioner, Sprint Communications Company L.P. (Sprint), is a limited partnership that has been certificated by the Nebraska Public Service Commission (Commission or NPSC) to provide competitive local exchange carrier (CLEC or competitive LEC) and other telecommunications services in the State of Nebraska, including local exchange areas served by the Respondent, Southeast Nebraska Telephone Company (SENTCO).

-4-

2. SENTCO is a corporation and is a rural incumbent local exchange carrier (ILEC) that has been certificated by the Commission to provide LEC and other telecommunications services in certain local exchange service areas in the State of Nebraska.

3. On December 16, 2004, SENTCO received a request from Sprint to negotiate terms and conditions of an interconnection agreement pursuant to § 252 (a) of the Telecommunications Act of 1996 (the Act). Thereafter, the parties proceeded with negotiations. As part of that negotiation, SENTCO made clear to Sprint, and Sprint confirmed, that SENTCO would not be engaging in voluntary negotiations "without regard to the standards set forth in subsection (b) . . . of section 251." 47 U. S.C. § 252(a) (1); see also Ex. 4. As a result of such negotiations, Sprint and SENTCO resolved all but two issues relating to the interconnection agreement.

4. On May 23, 2005, Sprint filed a Petition for Arbitration with the Commission, pursuant to § 252 (b) of the Act, seeking arbitration as to the remaining open issues. Attached to the Petition was the Interconnection and Reciprocal Compensation Agreement (the Agreement) between the parties that contains the terms and conditions of interconnection as agreed upon by the parties. The Agreement also reflects in Sections 1.6 and 1.22 the provisions that are disputed between the parties. . . .

* * *

II. ARBITRATED ISSUES

8. The two unresolved issues expressly identified and raised by Sprint in its Petition for Arbitration, and addressed in the Response thereto are:

Issue I: Should the definition of "End User or End User Customer" include end users of a service provider for whom Sprint provides interconnection and other telecommunications services? (Section 1.6 and as applied elsewhere in the Agreement.)

-5-

Issue II: Should the definition of "Reciprocal Compensation" include the transportation and termination on each carrier's network of all Local Traffic? (Section 1.21 and as applied elsewhere in the Agreement.)

## III. CASE SUMMARY

9. The parties agree that if Sprint's intended use of the Interconnection Agreement were limited to Sprint's provision of telecommunications service to Sprint retail customers located in SENTCO's exchange service areas, no issues would exist between the parties requiring arbitration. Tr. 99:14-19. Sprint has entered into a business arrangement with Time Warner Cable Information Services (Nebraska) LLC d/b/a Time Warner Cable (Time Warner) to support Time Warner's offering of local and long distance voice services in the Falls City area. SENTCO disputes that Sprint is entitled to utilize the Agreement for the benefit of Time Warner or any other third party. (See generally, Ex. 2).

10. Sprint expressed no intention of being the retail provider of telecommunications services. Rather, Time Warner will provide retail voice telecommunications services, will exclusively have all customer relationships, will market the service in the name of Time Warner, will perform all billing functions and will resolve all customer complaints. Tr. 27:9-28:1. Sprint has entered into a Wholesale Voice Services Agreement with Time Warner pursuant to which Sprint intends to provide certain telecommunications services to Time Warner on a wholesale basis. Ex. 20, Confidential Attachment.

11. The network over which telecommunications service is proposed to be provided to Time Warner's customers consists of a combination of Sprint and Time Warner facilities. See Ex. 107. In the case of a call originated by a Time Warner customer to another Time Warner customer, the call would be handled entirely by Time Warner on its own network. See Ex. 16, 13:11-23. In the case of a call originated by a Time Warner customer to a party that is not a Time Warner customer, the call travels from the customer's premises over Time Warner facilities to the Time Warner soft switch which routes the call to a gateway device that converts the call from Internet Protocol to

-6-

circuit switched format, at which point the call would be passed to the
Sprint network for termination. Ex. 16, 14:2-15, 31:5-21 and Ex. 12,
Ex. E. Time Warner's soft switch is responsible for routing of calls
originated by Time Warner customers. *See* Ex. 16, 32:4-10. The soft
switch directly serves the Time Warner customer.

      * * *

## VI. ANALYSIS

### A. Issue I

18. Sprint has entered into a business arrangement with Time
Warner to provide competitive alternatives to customers in Falls City,
Nebraska to the extent Time Warner can provide last mile facilities to
customers. Time Warner would be the company customers would
interface with while Sprint would provide Time Warner with certain
functionalities to enable Time Warner to provide a finished
telecommunications product. Sprint will provide telephone numbers,
911 circuits[] to the appropriate PSAP through the ILEC's selective
routers, would perform 911 database administration, directory listings,
and some switching functionalities, the extent to which is disputed by
the parties. Clearly, at the time the Commission granted Time Warner its
certificate of public convenience and necessity in Application No.
C-3228, we anticipated that Time Warner would enter the market in
Falls City. The Commission granted Time Warner the authority to
provide service in that area. However, we established a process in that
Order by [sic] which Time Warner was to use to enter the market in
competition with SENTCO. We stated that Time Warner must:

    1.    File written notice with the Commission when a bona fide
request has been sent either by it or its underlying carrier
to a rural ILEC.

    2.    The rural ILEC then will have 30 days in which to raise the
rural exemption as a reason not to negotiate or arbitrate an
agreement.

3.    The Commission will rule on the exemption in accordance with Telecommunications Act of 1996 (Act).

4.    The parties will either negotiate or arbitrate an agreement. The parties will file the agreement for approval. The Commission will then approve or reject the agreement in accordance with the Act.

*In the Matter of the Application of Time Warner Cable Information Services, LLC, d/b/a Time Warner Cable, Nebraska, Stamford, Connecticut, for a Certificate of Authority to provide local and interexchange voice services within the state of Nebraska*, Application No. C-3228 (November 23, 2004 ) at 5-6.

19. Time Warner has not taken any of the foregoing steps. Rather, Sprint takes the position that it is entitled to establish and [sic] interconnection agreement with SENTCO that will apply to end user customers of a third-party telecommunications carrier such as Time Warner.

20. We wholeheartedly support Time Warner and Sprint's goals to provide competitive alternatives to the Falls City consumers; however, we agree with SENTCO that Time Warner is the proper party to negotiate with SENTCO for bringing that service to Falls City. We encourage Time Warner and SENTCO, who we believe are the appropriate parties, to expeditiously work towards an interconnection agreement to provide service to customers in the Falls City exchange.

21. Independently of our finding that Time Warner is a necessary party to negotiate interconnection with SENTCO, we find, based on the record before us, Sprint has failed to demonstrate that it is a "telecommunications carrier" (47 U.S.C. § 153(44)) when it acts under its private contract with Time Warner. Further, we conclude the duty of the ILEC under § 251(b)(5) to establish reciprocal compensation arrangements extends properly to Time Warner as the entity operating the end office switch or, in this case its functional equivalent -- the Time Warner soft switch -- that directly serves the called party.

-8-

22. Through this soft switch, Time Warner ensures that only calls destined to the Public Switched Telephone Network originated by a Time Warner end user are transported through Sprint for termination, and it is through this soft switch that all calls are correctly routed to the Time Warner end user customers. Further, it is this soft switch that routes and delivers calls within the Time Warner network between two Time Warner end users. In this latter class of calls, Time Warner in no way utilizes the Sprint transport arrangement that Sprint and Time Warner have established through their private contract. Accordingly, we find that the soft switch operated by Time Warner provides the switching envisioned by the applicable FCC Rules and the Act. Consequently, under the Sprint/Time Warner private contract, it is only Time Warner as the owner of the soft switch, that can request a § 251(b)(5) reciprocal compensation arrangement from SENTCO.

23. While we find that our C-3228 Order addresses this issue, we also find independently, that we reach the same conclusion based on applying applicable case law, the Act and controlling FCC rules. A necessary pre-condition for an entity to assert rights under §§ 251(a) or (b) of the Act is that it must be a "telecommunications carrier." Compare 47 U.S.C. §§ 153(44), 251(a), and []252(a)(1). Section 153 (44) defines "telecommunications carrier" as "any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in Section 226)." Section 153(46), in turn, defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."

24. Relevant FCC and judicial precedents have interpreted the definition of "telecommunications carrier" to include only those entities that are "common carriers." *See Virgin Islands Telephone Corporation v. FCC*, 198 F.3d 921, 926 (D.C. Cir. 1999) ("*VITELCO*"); *see also National Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) *cert denied*, 425 U.S. 992 ("*NARUC I*"). Thus, as a matter of law, only where an entity is a common carrier can that entity assert rights to seek interconnection agreements under Section 251 of the Act. *See* 47 U.S.C. § 252 (a)(1); *see also* 47 U.S.C. § 251(a). The *VITELCO* court also made clear that the "key determinant" of common carrier/

telecommunications carrier status is whether an entity is "holding oneself[] out to serve indiscriminately." *VITELCO*, 198 F.3d at 927; citing *NARUC I*, 525 F.2d at 642. "But a carrier will not be a common carrier where its practice is to make individualized decisions in particular cases, whether and on what terms to deal. It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so." *NARUC I*, 525 F.2d at 641 (footnotes omitted); *see also VITELCO*, 198 F.3d at 925. Moreover, since a state commission assumes federal authority when it acts pursuant to Section 252 of the Act, the Commission is required to employ these standards when arbitrating an interconnection agreement. *See Bell Atlantic-Delaware, Inc. v. Global NAPs South, Inc.*, 77 F. Supp.2d 492, 500 (D.DE 1999) compare *AT&T Communications Systems v. Pacific Bell*, 203 F.3d 1183, 1188 (9th Cir. 1999); *Indiana Bell Telephone Company, Inc. v. Smithville Telephone Company, Inc.*, 31 F. Supp.2d 628, 632 (S.D. IL 1998).

25. Applying these standards to the record before us, we find that Sprint has not produced sufficient evidence to persuade us that it is a "telecommunications carrier" when it fulfills its private contractual obligation to Time Warner. Rather, Sprint's arrangement with Time Warner is an individually negotiated and tailored, private business arrangement shielded from public review and scrutiny. As such, Sprint cannot sustain any claim that it is eligible under Sections 251 and 252 to assert rights afforded "telecommunications carriers" through its arrangement with Time Warner. Although the Sprint witness testified that Sprint is willing to make its wholesale services available to others, it has not demonstrated by its actions that it is holding itself out "indiscriminately" to a class of users to be effectively available directly to the public.

26. We are unconvinced for many reasons. First, the Wholesale Voice Services Agreement is a private contract between Sprint and Time Warner and is treated by Sprint as confidential. Also, Sprint states that any agreement will be individually tailored to the cable company with which Sprint is contacting and Sprint will address the needs and capabilities as presented. *See* Ex. 102, Burt Testimony at 27. Independently, the individualized nature of Sprint's arrangements is demonstrated by the existence of both the Sprint-Time Warner

Wholesale Voice Services Agreement and the Sprint-Cable Montana LLC Wholesale Voice Service Agreement. *See* Ex. 20. Thus, the record confirms that Sprint tailors its arrangements with respect to those entities with which it wishes to contract. Further, Sprint has no tariff in place describing the standard business relationship that it will provide to an entity. *See* Ex. 102, Burt Testimony at 27. While Sprint has indicated that it will file such a tariff if directed by the Commission, we question that suggestion in that no submission of the sort has been made. Even if a tariff filing were to be made, we need the opportunity to scrutinize whether, as a matter of fact, the tariffed relationship was an indiscriminate offering of Sprint. In addition, the only service that Sprint unequivocally states will be offered "to the general public" is Sprint's offering of "exchange access." *See id.* at 21-22. However, we note that exchange access is the input for telephone toll services and is not local exchange traffic that is subject to § 251 (b)(5) reciprocal compensation according to 47 C.F.R. § 51.701(a) and (b) in which the FCC expressly excluded "intrastate exchange access" from the definition of "telecommunications traffic" to which reciprocal compensation applies.

27. Based on the record, there is only one user of Sprint's private contract services in Nebraska, Time Warner. *See* Ex. 20, Sprint Response to Admission No. 7. As one court noted, there is a substantial question as to whether a "single network user" could be found to be a "common carrier without being arbitrary and capricious . . ." *United States Telecom Association v. FCC*, 295 F.3d 1326, 1335 (D.C. Cir. 2002). Thus, as a consequence of Sprint's provision of services to Time Warner, Sprint fails to convincingly persuade us that its private contract service fits within the "classes of users as to be effectively available directly to the public . . ." in order to make Sprint qualify as a telecommunications carrier.

28. Sprint points out that a few other state commissions have addressed the type of contractual relationship established between Sprint and Time Warner. *See* Post-Hearing Brief of Sprint Communications Company L.P. (September 2, 2005) at 9. Specifically, Sprint states, the Illinois Commerce Commission, the New York Public Service Commission and the Public Utility Commission of Ohio have held that a service provider which provides network interconnection and other similar services to cable companies can interconnect with rural LECs.

-11-

*Id.* We have reviewed those decisions but we cannot agree with their conclusions based on the legal arguments and the facts provided to the Commission in this case.

B. Issue II

29. Even if Sprint were a telecommunications carrier when it fulfills its private contractual obligations to Time Warner we also find that Sprint cannot assert any right to seek § 251(b)(5) reciprocal compensation. In establishing the pricing standards for reciprocal compensation, Congress stated that "such terms and conditions [for reciprocal compensation] provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network of calls that originate on the network facilities of the other carrier." 47 U.S.C. § 252(d)(2)(ii). Moreover, the "origination" of a call occurs only on the network of the ultimate provider of end user service, which the FCC confirmed.

> We define "transport," for purposes of section 251(b)(5), as the transmission of terminating traffic that is subject to section 251(b)(5) from the interconnection point between the two carriers to the terminating carrier's end office switch that *directly serves the called party* (or equivalent facility provided by an non-incumbent carrier).

*See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Interconnection between Local Exchange Carriers and Commercial Radio Service Providers, First Report and Order*, CC Docket Nos. 96-98 and 95-185, 11 FCC Rcd 15499 (1996) at 16015 (¶1039) (emphasis added). Further, the applicable FCC rules state the same concept.

> (c) *Transport*. For purposes of this subpart, transport is the transmission and any necessary tandem switching of telecommunications traffic subject to section 251(b)(5) of the Act from the interconnection point between the two carriers to *the terminating carrier's end office switch that directly serves the called party*, or equivalent facility provided by a carrier other than an incumbent LEC.

-12-

(d) *Termination*. For purposes of this subpart, termination is the switching of telecommunications traffic at the *terminating carrier's end office switch, or equivalent facility, and delivery of such traffic to the called party's premises*.

(e) *Reciprocal compensation*. For purposes of this subpart, a reciprocal compensation arrangement between two carriers is one in which each of the two carriers receives compensation from the other carrier for the transport *and termination* on each carrier's network facilities of *telecommunications traffic that originates on the network facilities of the other carrier*.

47 C.F.R. §§ 51.701(c), (d) and (e) (emphasis added).

30. When these standards are applied to the facts, we find that substantial record evidence confirms that it would be Time Warner not Sprint that could assert the right to seek a reciprocal compensation arrangement under § 251(b)(5) with SENTCO. First, the record is clear that Time Warner serves the "called party" and is the only entity with the relationship with that end user that is the called party. *See, e.g.*, Tr. 27:20-23, 28:3-6.

31. Second, Time Warner operates the end office switch or equivalent facility since Time Warner has a "soft switch" (*see* Ex. 16, at 31 (lines 5-21)); it is the soft switch that performs switching since only those calls that are intended to be sent to the Public Switched Telephone Network are sent to Sprint with all other calls between Time Warner end users being switched solely between those end users by Time Warner. *See, e.g.*, Tr. 43:5-44:6. To this end, we agree with SENTCO that Sprint's efforts to equate the term "end office switch" with a Class 5 end office should be rejected. Since the term used by the FCC is "end office" or "equivalent facility" (*see* 47 C.F.R. § 51.701(c)), industry identifiers for Class 5 switches are not controlling. *See* Tr. 147:3-19.

32. Finally, the record confirms that all calls either originate or terminate on the Time Warner network facilities. *See, e.g.*, Ex. 102, Burt Testimony at 6 (line 131). Therefore, Sprint does not "directly serve . . .

-13-

the called party" (47 C.F.R. § 51.701(c)), nor does the traffic "originate" on Sprint's network. 47 C.F.R. § 51.701(e). Rather, it is Time Warner that owns the "last mile" over which the end user will "originate" a call, it is Time Warner's facilities that will "directly serve . . .the called party," and it is Time Warner's soft switch (or Sprint's newly enunciated term for Time Warner's soft switch -- the Time Warner "PBX-like switch") that terminates the call and provides the final switching to the called party.

33. We find unpersuasive Sprint's efforts to recast the network arrangement it anticipates having with Time Warner. Sprint seems to suggest that the Time Warner-provided network components are comprised of only the "local loop" (*see, e.g.*, Ex. 102, Burt Testimony at 6 (lines 131-132), 15 (line 354) to 16 (line 356) and Ex. 107), also suggesting that the Time Warner soft switch is a "PBX-like switch." Ex. 102, Burt Testimony at 16 (line 370). From the testimony provided by Time Warner, we believe Time Warner operates a soft switch and that this device provides switching not only for Time Warner end user to Time Warner end user calls but also for those calls made by and sent to a Time Warner end user from another carrier's end users.

34. Accordingly, we reject Sprint's efforts to suggest that its current network description now differs from that previously described to the Commission. Even during his testimony at the hearing, Sprint witness Burt stated "Any -- any call that does not go to the pubic switch telephone network, such as the example you gave, one Time Warner Cable subscriber to another, would stay within *Time Warner Cable switch*." Tr. 47:5-9 (emphasis added). We are not persuaded by Sprint's attempts to portray its switching facilities as the switch that directly serves the Time Warner end users.

## VII. RESOLUTION OF ISSUES

### A. Issue No. 1

Should the definition of "End User or End User Customer" include end users of a service provider for whom Sprint provides interconnection and other telecommunications services? (Section 1.6 and as applied elsewhere in the Agreement.)

-14-

35. For the reasons stated above, we find that this issue should be resolved in favor of SENTCO and that any reference to "third party" or "third parties" within the definition of "end user" be removed.

B. Issue No. 2

Should the definition of "Reciprocal Compensation" include the transportation and termination on each carrier's network of all Local Traffic? (Section 1.21 and as applied elsewhere in the Agreement.)

36. For the reasons stated above, we find that this issue should be resolved in favor of SENTCO and that no third party traffic shall be subject to this Agreement. Thus, the only traffic that will be exchanged between SENTCO and Sprint under the terms of the Agreement is that which is generated by or terminated to the end user customers physically located within the SENTCO certificated area and for which both SENTCO and Sprint shall compete to provide retail end user services.

ORDER

IT IS THEREFORE ORDERED by the Nebraska Public Service Commission acting as Arbitrator in this proceeding that the issues presented in the Petition for Arbitration filed by Sprint shall be resolved in accordance with the foregoing Findings and Conclusions.

IT IS FURTHER ORDERED that an interconnection agreement containing the terms and conditions consistent with the findings set forth herein shall be filed with the Commission not later than October 13, 2005.

*In re Sprint Communications Co., L.P.*, Application No. C-3429, Findings and Conclusions, 2005 WL 3824447, **1-5 (Neb.P.S.C. Sep. 13, 2004).

As ordered, a signed interconnection agreement between Sprint and SENTCO was filed with the NPSC on October 11, 2005. Acting pursuant to the authority

granted to State commissions by section 252(c) of the Act,[4] the NPSC approved the interconnection agreement on November 22, 2005.

## B.  Sprint's Appeal

"In any case in which the State commission makes a determination under [section 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section[s] 251 . . . and [252]."  47 U.S.C.A. § 252(e)(6) (West 2001). State courts do not have jurisdiction to review decisions of State commissions "approving or rejecting an agreement" under section 252.  *Southwestern Bell Telephone Co. v. Connect Communications Corp.*, 225 F.3d 942, 944 (8th Cir. 2000); 47 U.S.C.A. § 252(e)(4) (West 2001).

Sprint commenced this action under section 252(e)(6) on the same day that the interconnection agreement was filed with the NPSC.  Named as defendants were the NPSC and each of its members (in their official capacities only).  On December 14, 2005, after SENTCO filed an unopposed motion to intervene, Sprint amended and supplemented its complaint to add SENTCO as a defendant and to reflect that the NPSC had approved the filed interconnection agreement.  TWC also filed a motion to intervene, which was denied on January 18, 2006.[5]

On March 14, 2006, about five weeks before briefing was to be concluded, SENTCO filed a motion to stay the case pending disposition by the FCC of a request for a declaratory ruling that was filed by TWC on March 1, 2006.  SENTCO

---

[4] "Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission."  47 U.S.C.A. § 252(c)(1) (West 2001).

[5] Although not allowed to intervene, TWC was granted leave to file briefs as *amicus curiae*, which it has done.

-16-

requested the stay "because TWC has requested the FCC to issue a declaratory ruling with regard to the same issue pending before this Court – namely, whether Sprint is a 'telecommunications carrier' entitled to obtain interconnection to exchange traffic with SENTCO on behalf of TWC." (Filing 60 at 3.) SENTCO acknowledged that "an order issued by the FCC that addresses the 'telecommunications carrier' issue presented in the [TWC] Petition would likely be binding on this Court." (Filing 65 at 5 (footnote omitted).) The NPSC joined in the stay motion, but Sprint vigorously opposed it, arguing that there was no assurance that the FCC would act on TWC's request, and, in any event, that the delay would be prejudicial. The stay was granted over Sprint's objections on May 15, 2006, and remained in effect until March 7, 2007, when the court was advised that the FCC had issued its ruling.

### C. FCC Declaratory Ruling

The FCC effectively held that the NPSC was wrong to conclude that Sprint could not request an interconnection for the benefit of TWC under the language of section 251(a) and (b). Because I will adhere to the statutory construction of the FCC, its memorandum opinion and order is set forth at length below:

I. INTRODUCTION

1. In this Order, the Wireline Competition Bureau (Bureau) grants a petition for declaratory ruling filed by Time Warner Cable (TWC) asking the Commission to declare that wholesale telecommunications carriers are entitled to interconnect and exchange traffic with incumbent local exchange carriers (LECs) when providing services to other service providers, including voice over Internet Protocol (VoIP) service providers pursuant to sections 251(a) and (b) of the Communications Act of 1934, as amended (the Act). As explained below, we reaffirm that wholesale providers of telecommunications services are telecommunications carriers for the purposes of sections 251(a) and (b) of the Act, and are entitled to the rights of telecommunications carriers under that provision. We conclude that state commission decisions denying wholesale telecommunications service

-17-

providers the right to interconnect with incumbent LECs pursuant to sections 251(a) and (b) of the Act are inconsistent with the Act and Commission precedent and would frustrate the development of competition and broadband deployment.

## II. BACKGROUND

### A. TWC's Petition

2.  On March 1, 2006, TWC filed a petition for declaratory ruling requesting that the Commission affirm that "requesting wholesale telecommunications carriers are entitled to obtain interconnection with incumbent LECs to provide wholesale telecommunications services to other service providers" (including VoIP-based providers). In its Petition, TWC states that in 2003 it began to deploy a facilities-based competitive telephone service using VoIP technology, which enables it to offer a combined package of video, high-speed data, and voice services. TWC purchases wholesale telecommunications services from certain telecommunications carriers, including MCI WorldCom Network Services Inc. (MCI) and Sprint Communications Company, L.P. (Sprint), to connect TWC's VoIP service customers with the public switched telephone network (PSTN). MCI and Sprint provide transport for the origination and termination on the PSTN through their interconnection agreements with incumbent LECs. In addition, MCI and Sprint provide TWC with connectivity to the incumbent's E911 network and other necessary components as a wholesale service.

3.  TWC claims that MCI has been unable to provide wholesale telecommunications services to TWC in certain areas in South Carolina and that Sprint has been unable to provide wholesale telecommunications services to TWC in certain areas in Nebraska because, unlike certain other state commissions, the South Carolina Public Service Commission (South Carolina Commission) and the Nebraska Public Service Commission (Nebraska Commission) have determined that rural incumbent LECs are not obligated to enter into interconnection agreements with competitive service providers (like MCI and Sprint) to the extent that such competitors operate as wholesale service providers.[FN7] [*See Petition of MCImetro Access Transmission Services LLC for Arbitration of Certain Terms and Conditions of*

*Proposed Agreement with Farmers Telephone Cooperative, Inc., Home Telephone Co., Inc., PBT Telecom, Inc., and Hargray Telephone Company, Concerning Interconnection and Resale under the Telecommunications Act of 1996*, Docket No. 2005-67-C, Order Ruling on Arbitration, Order No. 2005-544 (Oct. 7, 2005) (*South Carolina Commission RLEC Arbitration Order); Sprint Communications Company L.P., Overland Park, Kansas, Petition for arbitration under the Telecommunications Act, of certain issues associated issues with the proposed interconnection agreement between Sprint and Southeast Nebraska Telephone Company, Falls City*, Application No. C-3429, Findings and Conclusions (Sept. 13, 2005) (*Nebraska Commission Arbitration Order*) appeal filed, Sprint Communications Company L.P. v. Nebraska Public Service Commission, No. 4:05CV3260 (D. Neb. Oct. 11, 2005). As explained below, this aspect of the state decisions regarding wholesale services is not specific to wholesale carriers that serve VoIP service providers.] TWC argues that the South Carolina and Nebraska Commissions misinterpreted the statute when they decided, among other things, that competitive LECs providing wholesale telecommunications services to other service providers, in this case VoIP-based providers, are not "telecommunications carriers" for the purposes of section 251 of the Act, and, therefore, are not entitled to interconnect with incumbent LECs.

4. TWC asks the Commission to grant a declaratory ruling reaffirming that telecommunications carriers are entitled to obtain interconnection with incumbent LECs to provide wholesale telecommunications services to other service providers. The Petition also requests that the Commission clarify that interconnection rights under section 251 of the Act are not based on the identity of the wholesale carrier's customer.

B. State Commission Decisions

5. *South Carolina*. On October 8, 2004, MCI initiated interconnection negotiations pursuant to section 252(a) of the Act with four rural incumbent LECs operating in South Carolina. These rural incumbent LECs claimed that they were not required to accept traffic from a third-party provider that purchases wholesale telecommunications services from MCI. On March 17, 2005, MCI filed

-19-

a petition with the South Carolina Commission seeking arbitration of the unresolved issues between MCI and the rural incumbent LECs. In arbitrating this dispute, the South Carolina Commission agreed with the rural incumbent LECs that the arbitrated interconnection agreement should be limited to the traffic generated by the rural incumbent LECs' customers and MCI's direct end-user customers on their respective networks. The South Carolina Commission determined that MCI is not entitled to seek interconnection with the rural incumbent LECs with respect to the wholesale services MCI proposed to provide to TWC because such wholesale service does not meet the definition of "telecommunications service" under the Act and, therefore, MCI is not a "telecommunications carrier" with respect to those services. The South Carolina Commission also found that section 251(b) obligations "relate to parallel obligations between two competing telecommunications carriers" and that MCI's intent to act as an "intermediary for a facilities-based VoIP service provider" is a type of non-parallel relationship not contemplated or provided for under the Act.

6. *Nebraska.* On December 16, 2004, Sprint commenced interconnection negotiations with Southeast Nebraska Telephone Company (SENTCO), a rural incumbent LEC, pursuant to section 252(a) of the Act.[FN13] [*See Nebraska Commission Arbitration Order.*] In its September 13, 2005 arbitration decision, the Nebraska Commission determined that Sprint is not a "telecommunications carrier" under the *NARUC I* and *Virgin Islands* test for common carriage because the relationship between Sprint and TWC is an "individually negotiated and tailored, private business arrangement" that is an untariffed offering to a sole user of this service,[FN14] [*Id.* at 7-9 (citing *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) ( *NARUC I*), *cert. denied*, 425 U.S. 992 (1976); *Virgin Islands Tel. Co. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999)).] and, therefore, Sprint cannot assert any rights under sections 251 and 252 of the Act. In addition, the Nebraska Commission held that because TWC operates the switch that "directly serves the called party," Sprint was not entitled to exercise rights under section 251(b).[FN15] [*Id.* at 7-8.]

7. *Other State Proceedings*. TWC asserts that, in contrast to the South Carolina and Nebraska decisions, public utility commissions in Illinois, Iowa, New York and Ohio have recognized that wholesale

service providers, such as Sprint and MCI, are telecommunications carriers with rights under section 251 of the Act.[FN 16] [Petition at 8-9 (citing *Cambridge Telephone Company, et al. Petitions for Declaratory Relief and/or Suspensions for Modification Relating to Certain Duties under §§ 251(b) and (c) of the Federal Telecommunications Act*, Case Nos. 050259, et al., Order (Illinois Commerce Commission Aug. 23, 2005), appeal pending *Harrisonville Telephone Company, et al. v. Illinois Commerce Commission, et al.*, Case No. 3:06-CV-00073, GPMDGW, Complaint for Declaratory and Other Relief (S.D. Ill. filed Aug. 16, 2006); *Arbitration of Sprint Communications Co. v. Ace Communications Group, et al.*, Docket No. ARB-05-02, Order on Rehearing (Iowa Utilities Board Nov. 28, 2005); *Petition of Sprint Communications Company L.P., Pursuant to Section 252(b) of the Telecommunications Act of 1996 for Arbitration to Establish an Intercarrier Agreement with Independent Companies*, Case 05-C-0170, Order Resolving Arbitration Issues (New York Public Service Commission May 24, 2005), *on appeal Berkshire Telephone Corp. v. Sprint Communications Co. L.P.*, Civ. Action No. 05-CV-6502 (CJS)(MWP)(W.D.N.Y. filed Sept. 26, 2005); *Application and Petition in Accordance with Section II.A.2.B of the Local Service Guidelines Filed by: The Champaign Telephone Co., Telephone Services Co., the Germantown Independent Telephone Co., and Doylestown Telephone Co.*, Case Nos. 04-1494-TP-UNC, et al., Finding and Order (Public Utility Commission of Ohio Jan. 26, 2005), *reh'g denied in pertinent part*, Order on Rehearing (Public Utilities Commission of Ohio Apr. 13, 2005)).] In addition, TWC and other commenters point to other state commissions that have before them pending proceedings on this same issue.

III. DISCUSSION

8. The Bureau grants TWC's request to the extent described below. Because the Act does not differentiate between retail and wholesale services when defining "telecommunications carrier" or "telecommunications service," we clarify that telecommunications carriers are entitled to interconnect and exchange traffic with incumbent LECs pursuant to section 251(a) and (b) of the Act for the purpose of providing wholesale telecommunications services.[FN18] [Because neither of the primary state commission proceedings underlying the Petition

relied on or even interpreted section 251(c) of the Act, we do not read the Petition to seek clarification on the ability to interconnect pursuant to that provision. As such, we only address the issues raised in the Petition as they apply to sections 251(a) and (b) of the Act.] The Bureau finds that a contrary decision would impede the important development of wholesale telecommunications and facilities-based VoIP competition, as well as broadband deployment policies developed and implemented by the Commission over the last decade, by limiting the ability of wholesale carriers to offer service.

A. "Telecommunications Service" Can Be Either a Wholesale or Retail Service

9. Consistent with Commission precedent, we find that the Act does not differentiate between the provision of telecommunications services on a wholesale or retail basis for the purposes of sections 251(a) and (b), and we confirm that providers of wholesale telecommunications services enjoy the same rights as any "telecommunications carrier" under those provisions of the Act.[FN19] [To resolve the confusion over the meaning of "wholesale," we affirm the longstanding Commission usage of a wholesale transaction of a service or product as an input to a further sale to an end user, in contrast to a retail transaction for the customer's own personal use or consumption. *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, Second Report and Order, 14 FCC Rcd 19237, 19423, para. 13 (1999) ("Black's Law Dictionary defines retail as '[a] sale for final consumption in contrast to a sale for further sale or processing (*i.e.*, wholesale) . . . to the ultimate consumer.'") (quoting Black's Law Dictionary 1315 (6th ed. 1990)).] We further conclude that the statutory classification of the end-user service, and the classification of VoIP specifically, is not dispositive of the wholesale carrier's rights under section 251.

10. The Act defines "telecommunications" to mean "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[FN20] [47 U.S.C. § 153(43).] The Act defines "telecommunications service" to mean "the offering of telecommunications for a fee directly to the public, or to such

classes of users as to be effectively available directly to the public, regardless of the facilities used."[FN21] [47 U.S.C. § 153(46).] Finally, any provider of telecommunications services is a "telecommunications carrier" by definition under the Act.[FN22] [47 U.S.C. § 153(44).]

11. It is clear under the Commission's precedent that the definition of "telecommunications services" is not limited to retail services, but also includes wholesale services when offered on a common carrier basis. The South Carolina Commission's contrary interpretation -- that services provided on a wholesale basis to carriers or other providers are not telecommunications services because they are not offered "directly to the public" has been expressly rejected by the Commission in the past, as we explain below.

12. The definition of "telecommunications services" in the Act does not specify whether those services are "retail" or "wholesale," but merely specifies that "telecommunications" be offered for a fee "directly to the public, or to such classes of users as to be effectively available directly to the public."[FN25] [47 U.S.C. § 153(46).] In *NARUC II*, the D.C. Circuit stated that "[t]his does not mean that the particular services offered must practically be available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users."[FN26] [*National Ass'n of Regulatory Utility Com'rs v. FCC*, 533 F.2d 601, 608 (C.A.D.C. 1976) (*NARUC II*).] Thus, the question at issue in this proceeding is whether the relevant wholesale telecommunications "services" are offered "directly to the public, or to such classes of users as to be effectively available directly to the public." Indeed, the definition of "telecommunications services" long has been held to include both retail and wholesale services under Commission precedent. In the *Non-Accounting Safeguards Order*, the Commission concluded that wholesale services are included in the definition of "telecommunications service."[FN27] [*Non-Accounting Safeguards Order*, 11 FCC Rcd at 22033, para. 264.] To reach this result, the Commission determined that the term "wholesale" in section 251(c)(4) "implicitly recognizes that some telecommunications services are wholesale services."[FN28] [*Id. See also* 47 U.S.C. § 251(c)(4) (requiring incumbent LECs "to offer for resale at *wholesale* rates any *telecommunications service* that the carrier provides

-23-

at retail to subscribers who are not telecommunications carriers") (emphasis added).] The *Non-Accounting Safeguards Order* went on to find that the legislative history of the Act also supports this determination, as it "indicates that the definition of telecommunications services is intended to clarify that telecommunications services are common carrier services, which include wholesale services to other carriers" and that "the term 'telecommunications service' was not intended to create a retail/wholesale distinction."[FN29] [*Id.* at 22032-33, 22033-34, paras. 263, 265.] The Commission affirmed these conclusions in the *Non-Accounting Safeguards Reconsideration Order* where it found "no basis in the statute, legislative history, or FCC precedent for finding the reference to 'the public' in the statutory definition to be intended to exclude wholesale telecommunications services."[FN30] [*Non-Accounting Safeguards Reconsideration*, 12 FCC Rcd at 8670-71, para. 33.] Further, in the *Universal Service Order*, the Commission determined that, while "telecommunications services" are intended to encompass only telecommunications provided on a common carrier basis, "common carrier services include services offered to other carriers, such as exchange access service, which is offered on a common carrier basis, but is offered primarily to other carriers."[FN31] [*Universal Service Order*, 12 FCC Rcd at 9177-8, para. 785.] In *Virgin Islands*, the D.C. Circuit stressed that the Commission did not rely on a wholesale-retail distinction, stating that "the focus of its analysis is on whether AT&T-SSI offered its services indiscriminately in a way that made it a common carrier . . . and the fact that AT&T-SSI could be characterized as a wholesaler was never dispositive."[FN32] [*Virgin Islands Tel. Co. v. FCC*, 198 F.3d 921, 930 (D.C. Cir. 1999) (*Virgin Islands*).]

13. We further find that our decision today is consistent with and will advance the Commission's goals in promoting facilities-based competition as well as broadband deployment. Apart from encouraging competition for wholesale services in their own right,[FN33] [As explained above, *see supra* para. 1, we affirm today the rights of all wholesale carriers to interconnect when providing service to other providers, and therefore we reject the notion that we must dismiss the Petition in part with respect to the Nebraska Commission's decision because the *Nebraska Commission Arbitration Order* did not discuss Sprint's provision of service to VoIP providers. *See* Letter from Thomas J. Moorman and Paul M. Schudel, Counsel to SENTCO, to Marlene H.

Dortch, Secretary, FCC, WC Docket No. 06-55 (filed Feb. 12, 2007).] ensuring the protections of section 251 interconnection is a critical component for the growth of facilities-based local competition. Moreover, as the Commission has recognized most recently in the *VoIP 911 Order*, VoIP is often accessed over broadband facilities, and there is a nexus between the availability of VoIP services and the goals of section 706 of the Act.[FN35] [*IP-Enabled Services, WC Docket No. 04-36; E911 Requirements for IP-Enabled Service Providers*, WC Docket No. 05-196, First Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 10245, 10264, para. 31 (2005) ( VoIP 911 Order) (citing 47 U.S.C. §157 nt.). Section 706 directs the Commission (and state commissions with jurisdiction over telecommunications services) to encourage the deployment of advanced telecommunications capability to all Americans by using measures that "promote competition in the local telecommunications market" and removing "barriers to infrastructure investment." *Id.*] Furthermore, as the Petition and some commenters note, in that order the Commission expressly contemplated that VoIP providers would obtain access to and interconnection with the PSTN through competitive carriers. Therefore, we also rely on section 706 as a basis for our determination today that affirming the rights of wholesale carriers to interconnect for the purpose of exchanging traffic with VoIP providers will spur the development of broadband infrastructure. We further conclude that such wholesale competition and its facilitation of the introduction of new technology holds particular promise for consumers in rural areas.

14. In making this clarification, we emphasize that the rights of telecommunications carriers to section 251 interconnection are limited to those carriers that, at a minimum, do in fact provide telecommunications services to their customers, either on a wholesale or retail basis. We do not address or express any opinion on any state commission's evidentiary assessment of the facts before it in an arbitration or other proceeding regarding whether a carrier offers a telecommunications service. However, we make clear that the rights of telecommunications carriers under sections 251 (a) and (b) apply regardless of whether the telecommunications services are wholesale or retail, and a state decision to the contrary is inconsistent with the Act and Commission precedent.[FN40] [*See South Carolina Commission RLEC Arbitration Order* at 14 (limiting the definition of end user to subscriber

-25-

of telephone exchange service); *Nebraska Commission Arbitration Order* at 9, paras. 25-26 (reasoning that the exclusion of exchange access in the Commission's reciprocal compensation rules indicates that TWC's offering of exchange access is not offered to the general public). Although the Nebraska Commission's order expressly raised the issue of Sprint's entitlement to reciprocal compensation pursuant to section 251(b)(5), commenters contend that the Nebraska Commission's decision properly is interpreted to affect section 251(a) and (b) rights more broadly. *See* AT&T Comments at 1-2. We do not address commenters' requests for classification of other specific service offerings or traffic arrangements. *See, e.g.*, Neutral Tandem Comments (seeking a declaration of section 251 rights to provide tandem switching and transit services).]

   B. The Section 251 (a) and (b) Rights of a Wholesale Telecommunications Carrier Do Not Depend on the Regulatory Classification of the Retail Service Offered to the End User

   15. As explained above, a provider of wholesale telecommunications service is a telecommunications carrier and is entitled to interconnection under section 251 of the Act. The regulatory classification of the service provided to the ultimate end user has no bearing on the wholesale provider's rights as a telecommunications carrier to interconnect under section 251. As such, we clarify that the statutory classification of a third-party provider's VoIP service as an information service or a telecommunications service is irrelevant to the issue of whether a wholesale provider of telecommunications may seek interconnection under section 251(a) and (b). Thus, we need not, and do not, reach here the issues raised in the *IP-Enabled Services* docket, including the statutory classification of VoIP services.[FN41] [In the *IP-Enabled Services NPRM*, the Commission sought comment on whether VoIP should be classified as a telecommunications service or an information service. *See IP-Enabled Services NPRM*, WC Docket No. 04-36, Notice of Proposed Rulemaking, 19 FCC Rcd 4863 (2004) (*IP-Enabled Services NPRM*).] We thus reject the arguments that the regulatory status of VoIP is the underlying issue in this matter or that Commission action on this Petition will prejudge issues raised in the IP-Enabled Services docket. We also make clear that we do not address any entitlement of a retail service provider to serve end users through

-26-

such a wholesale arrangement, nor, contrary to the views of some commenters, do we read the Petition to seek such rights.[FN43] [*See, e.g.*, JSI Comments at 12 ("Time Warner is seeking to claim specific rights without accepting attendant obligations."); ITTA Comments at 12 ("In other words, entities that seek the benefits of carrier-type interconnection, including for example, the right to obtain numbering resources and number portability, should be subject to the same obligations as the traditional carriers with whom they compete."); Western Alliance at 3, 6 ("TWC is not entitled to any CLEC rights under Section 251 and 252 as long as it elects to reject its former CLEC status and characterize itself instead as a non-regulated information service provider."). Furthermore, and contrary to the position put forth in the *South Carolina Commission Arbitration Order* and the assertions of some commenters, we do not read the Act or have any policy reason to impose a requirement that telecommunications carriers seeking to interconnect must have obligations or business models parallel to those of the party receiving the interconnection request. *See South Carolina Commission Arbitration Order* at 9 (stating that "obligations imposed by Section 251(b) . . . relate to parallel obligations between two competing telecommunications carriers"); SCTC Comments at 8 (arguing that "the obligations imposed by Section 251(b) . . . relate to parallel obligations between two competing telecommunications carriers within a common local calling area."). *See also* Letter from Gerard J. Duffy, Counsel for Western Telecommunications Alliance, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 06-55 at 6 (filed Feb. 6, 2007) (stating that the "Sprint-Time Warner Model Unfairly Tilts Competitive Playing Field" and that Time Warner is not subject to the Title II and consumer protection standards of incumbent LECS).] Rather, in issuing this decision, we reiterate that we only find that a carrier is entitled to interconnect with another carrier pursuant to sections 251(a) and (b) in order to provide wholesale telecommunications service.

16. Finally, we emphasize that our ruling today is limited to telecommunications carriers that provide wholesale telecommunications service and that seek interconnection in their own right for the purpose of transmitting traffic to or from another service provider. To address concerns by commenters about which parties are eligible to assert these rights,[FN44] [*See, e.g.*, JSI Comments at 4 ("MCI's role as an intermediary

-27-

is to be largely hands-off and remote."); SCTC Comments at 11-14 (asserting that "MCI merely proposed to act as an intermediary -- a 'connection' -- between two facilities-based carriers -- the RLEC and Time Warner," and that "Time Warner is seeking . . . to make an 'end run' around the important federal state proceedings and powers"); Western Alliance at 3 ("What TWC is asking herein is for MCI and Sprint to be authorized to use the Section 252 procedures and to negotiate Section 251(b) and/or Section 252(c) interconnection agreements in TWC's behalf . . . ."). Although the Petition does refer in passing to MCI and Sprint acting "on behalf of" TWC, the focus of the Petition and even the underlying state commission decisions concern the rights of those carriers as wholesale telecommunications service providers, and we therefore do not reach the question of the rights of an agent of a VoIP service provider. *See* Petition at 12, 23; South Dakota Comments at 6. *See also*, Black's Law Dictionary (8th ed. 2004) (defining agent as "[o]ne authorized to act for or in place of another" or "representative").] we make clear that the scope of our declaratory ruling is limited to wholesale carriers that are acting as telecommunications carrier for purposes of their interconnection request. In affirming the rights of wholesale carriers, we also make clear that today's decision in no way diminishes the ongoing obligations of these wholesalers as telecommunications carriers, including compliance with any technical requirements imposed by this Commission or a state commission. In addition, we agree that it is most consistent with Commission policy that where a LEC wins back a customer from a VoIP provider, the number should be ported to the LEC that wins the customer at the customer's request, and therefore we make such a requirement an explicit condition to the section 251 rights provided herein. Other concerns about porting will be addressed in the *IP-Enabled Services* proceeding.

C. Other Issues Raised by Commenters

17. Certain commenters ask us to reach other issues, including the application of section 251(b)(5) and the classification of VoIP services. We do not find it appropriate or necessary here to resolve the complex issues surrounding the interpretation of Title II more generally or the subsections of section 251 more specifically that the Commission is currently addressing elsewhere on more comprehensive records. For example, the question concerning the proper statutory classification of

VoIP remains pending in the *IP-Enabled Services* docket. Moreover, in this declaratory ruling proceeding we do not find it appropriate to revisit any state commission's evidentiary assessment of whether an entity demonstrated that it held itself out to the public sufficiently to be deemed a common carrier under well-established case law. In the particular wholesale/retail provider relationship described by Time Warner in the instant petition, the wholesale telecommunications carriers have assumed responsibility for compensating the incumbent LEC for the termination of traffic under a section 251 arrangement between those two parties. We make such an arrangement an explicit condition to the section 251 rights provided herein. We do not, however, prejudge the Commissions' determination of what compensation is appropriate, or any other issues pending in the *Intercarrier Compensation* docket.

D. Procedural Issues

18. Jurisdiction. We reject SENTCO's contention that the Commission lacks jurisdiction over TWC's Petition because it is a request for preemption of state decisions on issues assigned by statute specifically to states for review. TWC filed its petition as a request for declaratory ruling requesting clarification of the interpretation of the 1996 Act pursuant to section 1.2 of the Commissions rules.[FN55] [47 C.F.R. § 1.2.] As such, the Commission's authority over particular state decisions is not at issue here. And in any event, the Act establishes -- and courts have confirmed -- the primacy of federal authority with regard to several of the local competition provisions in the 1996 Act. First, section 201(b) authorizes the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act."[FN56] [47 U.S.C. § 201(b).] As the Supreme Court has noted, this provision "*explicitly* gives the FCC jurisdiction to make rules governing matters to which the 1996 Act applies" -- including issues addressed by section 251.[FN57] [*BellSouth Telecommunications, Inc. Request for Declaratory Ruling that State Commissions May Not Regulate Broadband Internet Access Services by Requiring BellSouth to Provide Wholesale or Retail Broadband Services to Competitive LEC UNE Voice Customers*, WC Docket No. 03-251, Memorandum Opinion and Order and Notice of Inquiry, 20 FCC Rcd 6830, 6841, para. 22 (2005) (BellSouth DSL Order) (quoting *AT&T Corp. v. Iowa Utils. Bd.*,

525 U.S. 366, 380 (1999) (emphasis in original)).] Second, except in limited cases, the Commission's authority with regard to the issues of local competition specified in section 251 supersede state jurisdiction over these matters.[FN58] [The Act, for example, expressly assigns to the states the authority to arbitrate interconnection disputes between carriers and incumbent LECs and, subject to the general framework set forth by the Commission, to establish appropriate rates for competitive carriers' use of unbundled network elements. *See generally* 47 U.S.C. § 252.] In the Supreme Court's words, "the question . . . is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has."[FN59] [*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 379 n.6 (1999). *See also Southwestern Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d 942, 946-47 (8th Cir. 2000) ("The new regime for regulating competition in this industry is federal in nature . . . and while Congress has chosen to retain a significant role for the state commissions, the scope of that role is measured by federal, not state law."); *Pacific Bell v. Pac-West Telecomm, Inc*., 325 F.3d 1114, 1127 (9th Cir. 2003) ("[T]he Act *limited* state commissions' authority to regulate local telecommunications competition.") (emphasis in original); *MCI Telecom Corp. v. Illinois Bell*, 222 F.3d 323, 342-43 (7th Cir. 2000) (stating, "with the 1996 Telecommunications Act . . . Congress did take over some aspects of the telecommunications industry," and "Congress, exercising its authority to regulate commerce has precluded all other regulation except on its terms"). Moreover, as the D.C. Circuit has held, the Commission is entitled to *Chevron* deference when applying the definition of "telecommunications carrier" in the context of a wholesale service provider. *Virgin Islands*, 198 F.3d at 926 (citing *Chevron U.S.A. Inc. v. Natural Resources Council, Inc.*, 467 U.S. 837, 843 (1984)).] In clarifying existing statutory requirements under the Act as interpreted by the Commission, however, the Commission's decision may affect state decisions if state commissions have differing interpretations of the statute.

19. *Notice*. We disagree with the assertion that the Petition should be dismissed because TWC did not serve the Petition on the Nebraska Commission.[FN60] [Nebraska Commission Comments at 7-8. The Nebraska Commission argues that the Petition effectively seeks to

preempt state or local regulatory authority. As such, pursuant to Note 1 in section 1.1206(a) of the Commission's rules, the Nebraska Commission asserts that TWC is required to serve the original petition on the state "the actions of which are specifically cited as a basis for requesting preemption." 47 C.F.R. § 1.1206(a) Note 1 to Paragraph.] We do not read the Petition for Declaratory Ruling as a request for preemption of a particular order that would trigger this requirement. In its Petition, TWC requests that the Commission make a statement clarifying the conflicting interpretations among the states concerning wholesale carriers' rights under sections 251(a) and (b). Although TWC specifically describes the decisions of the Nebraska Commission and South Carolina Commission in its argument, this Petition for Declaratory Ruling does not request state preemption and we do not make any determination about whether to preempt any specific state decisions. As such, there is no notice requirement at issue.

IV. ORDERING CLAUSES

20. Accordingly, IT IS ORDERED, pursuant to sections 1, 3, 4, 201-205, 251, and 252 of the Communications Act, as amended, 47 U.S.C. §§ 151, 153, 154, 201-205, 251, and 252, and authority delegated under sections 0.91 and 0.291 of the Commission's rules, 47 C.F.R. §§ 0.91 and 0.291, that the petition for declaratory ruling filed by Time Warner Cable in WC Docket No. 06-55 IS GRANTED to the extent described by this Order.

*In the Matter of Petition of Time Warner Cable for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection under Section 251 of the Communications Act of 1934, as amended, to Provide Wholesale Telecommunications Services to VoIP Provider*, 2007 WL 623570 at **1-7, 22 F.C.C.R. 3513, 22 FCC Rcd. 3513 (F.C.C. Mar. 1, 2007) (No. WC06-55, DA07-709) (additional footnotes omitted).

## DISCUSSION

This court must defer to the interpretation given by the FCC to an ambiguous statute that it is charged with enforcing, so long as it is a reasonable interpretation. *See Southwestern Bell Telephone Co. v. Connect Communications Corp.*, 225 F.3d 942, 946 (8th Cir. 2000). *See also WWC License, L.L.C. v. Boyle*, 459 F.3d 880, 890 (8th Cir. 2006) (deference owed to FCC's interpretation of Telecommunications Act of 1996 because Congress expressly charged the FCC with the duty to promulgate regulations to interpret and carry out the Act).

In light of the FCC's declaratory ruling, SENTCO and the NPSC no longer contend as a matter of law that TWC was required to submit the interconnection request under section 251(a).[6]  The defendants instead focus on the statutory definition of a "telecommunications carrier" and argue that Sprint does not qualify in this instance because the evidence presented to the NPSC failed to establish that Sprint would be acting as a "common carrier".

While "the scope of [the FCC's] declaratory ruling is limited to wholesale carriers that are acting as telecommunications carriers for purposes of their interconnection request," *id.* at *6 (¶ 16), and while the FCC also indicated in its ruling that a wholesale carrier only acts as a "telecommunications carrier" when the services it provides are "offered on a common carrier basis," *id.* at *3 (¶ 11), the various factors cited by the NPSC for concluding that Sprint is not a "common carrier"—namely, that Sprint and TWC entered into a private, confidential contract;

---

[6] As will be discussed later, SENTCO and the NPSC have not abandoned their argument that Sprint is not the proper party to enter into a reciprocal compensation arrangement under section 251(b)(5).  However, as clearly stated in the FCC's ruling, "the rights of telecommunications carriers under sections 251 (a) and (b) apply regardless of whether the telecommunications services are wholesale or retail, and a state decision to the contrary is inconsistent with the Act and Commission precedent." *In the Matter of Petition of Time Warner Cable,* 2007 WL 623570 at *5 (¶ 14).

that the contract was individually tailored to meet TWC's needs; that Sprint has no tariff on file; that Sprint offers no telecommunications services directly to the general public; and that TWC is the only user of Sprint's private contract services in Nebraska—are not dispositive of the "telecommunications carrier" issue.  The NPSC also found that "[t]he network over which telecommunications service is proposed to be provided to Time Warner's customers consists of a combination of Sprint and Time Warner facilities," *In re Sprint Communications Co., L.P.*, 2005 WL 3824447 at *2 (¶ 11), and that "the Sprint witness testified [without refutation] that Sprint is willing to make its wholesale services available to others," *id.* at *3 (¶ 25 ).[7]  These two findings of fact are sufficient to establish that Sprint's services are offered on a common carrier basis.

This same issue was addressed recently in *Consolidated Comm. Fort Bend v. Public Utility Comm'n*, __ F. Supp. 2d __, 2007 WL 2116423, No. A-06-CA-825-LV, (W.D.Tex., July 24, 2007), when an incumbent local exchange carrier (Consolidated) appealed from a decision of the Texas Public Utility Commission (PUCT) requiring it to interconnect with Sprint.  In upholding the PUCT's decision, the district court analyzed the "common carrier" issue as follows:

> Consolidated agrees with the PUCT's recognition in its Final Order that *National Association of Regulatory Utility Commissioners v. Federal Communications Commission* ("*NARUC I*") and its progeny established the test that is to be applied to Sprint's activities in determining whether Sprint is a telecommunications carrier under the Act.  525 F.2d 630, 642-43 (D.C. Cir.1976); *see also National Assoc. of Regulatory Util. Comm'rs v. Federal Communications Comm'n*, 533 F.2d 601 (D.C.Cir. 1976) ("*NARUC II*"); *Virgin Islands Tel. Corp. v. F.C.C.*, 198 F.3d 921, 926-27 (D.C.Cir. 1999).  Pursuant to *NARUC I*, to be a telecommunications carrier under the Telecommunications Act, Sprint must hold itself out "indiscriminately to the clientele one is suited to serve." 525 F.2d at 641. "The key factor is that the operator offer

---

[7] Indeed, the evidence shows that Sprint has entered into a wholesale sevices contract with another cable company, Cable Montana, LLC.

indiscriminate service to whatever public its service may legally and practically be of use." *Id.* at 642. Further, the services must be "effectively available directly to the public." 47 U.S.C. § 153(46).

Consolidated's challenge is that Sprint is not holding itself out indiscriminately to the clientele one is suited to serve, which here, Consolidated contends are entities that have last mile facilities suitable to function as residential loops, because Sprint holds the pricing of its wholesale services confidential and provides its wholesale services to the last-mile providers under privately negotiated, individually crafted agreements.

Sprint responds that, as its wholesale service tariff in Texas reflects, it incorporates individual case basis pricing, rather than fixed published rates, when contracting with cable companies.[8] Sprint's position is that neither the negotiation of individual contracts with cable companies, nor the absence of a single published price list, detracts from Sprint's status as a telecommunications carrier entitled to request interconnection with Consolidated. Sprint's position is that it offers its services to such classes of users as to be effectively available directly to the public, regardless of the facilities used, in an indiscriminate manner to whatever public its services may legally and practically be of use.

The Court notes that the parties focus on different relationships: Consolidated focuses the Court toward the relationship between Sprint and the cable company, and Sprint focuses the Court toward the relationship between Sprint and the end-user customer. Based on Sprint's business model, without Sprint's services, the end-user customer who subscribes to the Sprint-cable company service would be incapable of placing or receiving telephone calls, as Sprint's switch performs all switching and routing functions for local, domestic, and foreign toll, emergency, operator assisted, and directory assistance

---

[8] The court found that "the tariff provides additional evidence that Sprint holds itself out to serve all potential users indifferently," but noted that a filed tariff is "not required for a carrier to be considered a common carrier." 2007 WL 2116423 at *7.

calls.[9] Thus, Sprint provides telecommunication services, and does so in a manner that offers indiscriminate service which is "effectively available directly to the public." Further Sprint's involvement in the joint provisioning of local telephone exchange service supports the PUCT's conclusion that Sprint is a telecommunications carrier. *See Berkshire Tel. Corp. v. Sprint*, No. 05-CV-6502, 2006 WL 3095665 (W.D.N.Y Oct. 30, 2006).

In *Berkshire*, the ILEC plaintiff, argued, as does Consolidated here, that it was not required to enter into an interconnection agreement with Sprint because Sprint was not a telecommunications carrier. *Id.* at *1. The *Berkshire* court, despite finding that the record failed to support the state commission's finding that Sprint was a common carrier, "insofar as that finding pertains to the services that Sprint provides to other telecommunications companies such as Time Warner," the court nevertheless determined that Sprint was a common carrier because "the services Sprint is providing . . . will be available to any end user within the specified service territory, albeit through the business relationship

---

[9] In the present case, the NPSC determined that Time Warner would perform some switching and routing of calls, and that calls placed directly between Time Warner's customers in Falls City would not require the use of Sprint's services (or the interconnection with SENTCO). The Commission stated:

> In the case of a call originated by a Time Warner customer to another Time Warner customer, the call would be handled entirely by Time Warner on its own network. In the case of a call originated by a Time Warner customer to a party that is not a Time Warner customer, the call travels from the customer's premises over Time Warner facilities to the Time Warner soft switch which routes the call to a gateway device that converts the call from Internet Protocol to circuit switched format, at which point the call would be passed to the Sprint network for termination.

*In re Sprint Communications Co., L.P.*, 2005 WL 3824447 at *2 (¶ 11) (citations to exhibits omitted). Even so, the fact remains that Time Warner's customers in Falls City would not be able to place calls to, or receive calls from, SENTCO's customers without using Sprint's services.

with [Time Warner]." *Id.* at *5-6. The relationship in *Berkshire* was that "Time Warner provides the local loop and Sprint provides the end office switch and interconnection trunk." *Id.* Thus, reasoned the *Berkshire* court, whatever the arrangements between Sprint and a participating cable company, ultimately Sprint's portion of the services offered would be available indiscriminately to the end user, even though the end user would only deal directly with the cable company, Time Warner. *Id.* at *6. The Berkshire court recognized that this arrangement was "an undisputedly new type of business arrangement" and held that it was

> not erroneous for the [state commission] to consider the provision of services to 'Time Warner's customers' in deciding that Sprint is acting as a common carrier, since under this new business arrangement, the services being purchased are being provided only through the combined efforts of both companies, even though the end users deal directly with Time Warner.

*Id.* Further, with regard to whether Sprint was a common carrier as to the services it provides to other telecommunications companies, such as Time Warner, the *Berkshire* court determined the record lacked substantial evidence to make such a finding rather than that such a finding was impossible as a matter of law. *Id.* at *5.

This Court finds the *Berkshire* court's opinion persuasive, particularly in light of the purpose of the Telecommunications Act, which is to promote competition in the telecommunications market. *See AT & T Corp.*, 525 U.S. at 371, 119 S.Ct. 721. The Court observes that in this cause, Sprint's business model includes the same type of relationship between Sprint and a cable company as existed in *Berkshire* between Sprint and Time Warner. *Id.* Here, the PUCT found that Sprint "will offer its services to all entities *who desire to take them* and who have comparable 'last mile' facilities suitable to function as residential loops." Final Order at 12 (Emphasis added.) Although Consolidated does not challenge this finding of fact by the PUCT, it argues that the PUCT "made no finding that Sprint offers and will offer its services to all potential users indifferently." Consolidated contends that Sprint's service offerings differ depending upon the needs of each cable

-36-

company, that Sprint will not disclose its prices for those services, and that Sprint's prices will vary among the cable companies. Consolidated contends that because of this, Sprint holds itself out differently by making individualized decisions as to the same class of customers, the last mile providers, and by so doing is nothing more than a private carrier.

With this argument, Consolidated focuses away from the Sprint and end-user customer relationship and toward the relationship between Sprint and a cable company or other entity that would have last mile facilities suitable to function as residential loops. However, when focusing on the relationship of Sprint and the end-user customer, the Court finds the PUCT's finding (16) that Sprint's offer is to those "who desire to take them" is consistent with *NARUC I*'s requirement that "to be a common carrier one must hold oneself out indiscriminately to the clientele one is suited to serve." 525 F.2d at 641. Sprint's business model provides that Sprint supplies the switching service and other network components, to the extent needed by various cable companies, that will carry all customers' telephone calls from Sprint's switch to the networks of other service providers. Based on the business model, Sprint also provides all number administration functions and performs the porting function for every telephone number. Further, Sprint also is responsible for all inter-carrier compensation, including exchange access and reciprocal compensation. Additionally, Sprint provisions 911 circuits, performs 911 database administration, and places directory listings in the directories of other carriers. Sprint, paired with a cable provider or other entity with last mile facilities suitable to function as residential loops, indiscriminately offers its services to the end-user customer.

Further, the Court notes that a common carrier's services need not be available to the entire public, as one may be a common carrier although the nature of the service rendered is "sufficiently specialized as to be of possible use to only a fraction of the total population." *Id.* But, a carrier will not be a common carrier if its practice is to make individualized decisions, in particular cases, whether and on what terms to deal. *Id.* Again, the key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use. *Id.* at 642.

As in *Berkshire*, here Sprint's services—its connection and switching services—will be of use to the cable companies and any who have comparable last mile facilities suitable to function as residential loops as well as the end-user customer indiscriminately. Regardless of any agreement Sprint may negotiate with a participating cable company, or entity that has last mile facilities suitable to function as residential loops, Sprint's services will reach all end-user customers indiscriminately. This Court finds no error as regarding the PUCT's determination that the fact Sprint negotiates with a cable company does not constitute a failure by Sprint to offer its services, particularly its switching and interconnection with other telecommunications companies indiscriminately. Moreover, the Court notes that the record reflects no evidence before the PUCT of Sprint refusing to serve any end-user customer in a discriminatory fashion, and further, the PUCT's finding of fact to that effect goes unchallenged. *See Woolsey v. National Transp. Safety Bd.,* 993 F.2d 516, 524 (5th Cir.1993) (no evidence that plaintiff ever turned away any member who was able to pay fees).

*Id.* at **4-7.

The final issue on appeal concerns SENTCO's obligation to enter into a reciprocal compensation arrangement with Sprint. Consistent with its ruling that Sprint could not request interconnection as a wholesale carrier under section 251(a), the NPSC ruled that a reciprocal compensation arrangement under section 251(b)(5) would only apply to local traffic "for which both SENTCO and Sprint shall compete to provide retail end user services." *In re Sprint Communications Co., L.P.*, 2005 WL 3824447 at *5 (¶ 36). This statutory interpretation cannot be reconciled with the FCC's declaratory ruling.

As construed by the NPSC, section 251(b)(5) would not require Sprint to compensate SENTCO for calls placed by TWC's customers because such calls would not "originate on the network facilities" of Sprint. *See* 47 U.S.C. § 252(d)(2)(A)(i). However, the FCC made such a compensation arrangement an "explicit condition" to the exercise of a wholesale carrier's right to interconnect with an incumbent local exchange carrier under section 251, stating:

> In the particular wholesale/retail provider relationship described by
> Time Warner in the instant petition, the wholesale telecommunications
> carriers have assumed responsibility for compensating the incumbent
> LEC for the termination of traffic under a section 251 arrangement
> between those two parties. We make such an arrangement an explicit
> condition to the section 251 rights provided herein.

*In the Matter of Petition of Time Warner Cable,* 2007 WL 623570 at *6 (¶ 17).

It is likewise clear that the NPSC erred in concluding that Sprint would not be entitled to demand compensation for calls placed by SENTCO's customers because of the fact that Sprint would be delivering the calls to TWC rather than directly to the end users. Although the FCC has defined the terms "transport" and "termination" for purposes of section 251(b)(5) as involving the delivery of calls to the end user, it is unreasonable to interpret these definitions in a manner which would preclude a wholesale carrier from receiving any compensation for the use of its facilities by the local exchange carrier. Rather, these definitions must be applied in a way which recognizes that calls may be delivered using the combined resources of the wholesale carrier and a third-party retail carrier. As stated by the *Berkshire* court:

> The PSC [New York Public Service Commission] . . . essentially [found]
> that Sprint and Time Warner together were providing "exchange
> service" to Time Warner's customers. As to that, the PSC set forth
> Sprint's argument as follows:
>
>> Pointing to the five network components of a competitive
>> local exchange company (CLEC) service (the local loop,
>> the end office switch, the interconnection trunks, and the
>> incumbent local exchange company (ILEC) switch and
>> loop) Sprint states that it will provide end office switching
>> and interconnection to end users. The only difference in the
>> model proposed here by Sprint and [Time Warner] is that
>> [Time Warner] will provide the CLEC local loop and the
>> telecommunications services will be provided under [Time
>> Warner's] name. End users will be connected to Sprint's

-39-

end office switch using the interconnection trun[k]s that it obtains from the ILECs.

Ultimately, the PSC concluded that "the reality of the business arrangement presented here [between Sprint and Time Warner] is that an alternative network will originate and terminate local traffic."

The Court finds that PSC's determination was not erroneous. In that regard, the Court understands PSC to have held that, in the ordinary case, a CLEC provides three components of local exchange service: 1) the local loop; 2) the end office switch; and 3) the interconnection trunks. However, here, these components are being provided by two companies working together, as opposed to a single CLEC. In other words, here there is no single company providing competitive local exchange service, but rather, there are two companies, each providing a portion of the exchange service. That being the case, the Court agrees that Sprint, acting on behalf of itself and Time Warner, is entitled to request the services listed under § 251(b).

*Berkshire Telephone Corp. v. Sprint*, 2006 WL 3095665 at **7-8 (internal citations omitted).

I therefore conclude as a matter of law that Sprint is entitled to be compensated by SENTCO, on behalf of both itself and TWC, for the transportation (*i.e.*, "the transmission . . . from the interconnection point between [Sprint and SENTCO] to [the Sprint/TWC] end office switch that directly serves the called party," *see* 47 C.F.R. § 51.701(c)) and termination (*i.e.*, "the switching . . . at [the Sprint/TWC] end office switch . . . and delivery . . . to the called party's premises," *see* 47 C.F.R. § 51.701(d)), of all calls placed by SENTCO's customers to TWC's customers over Sprint's network. In other words, I find that the definition of "reciprocal compensation" in the interconnection agreement must include the transportation and termination of each carrier's network of all "local traffic" (*i.e.*, all traffic originated by and terminated to end users who are physically located within SENTCO's local exchange service area).

**CONCLUSION**

As anticipated by SENTCO and the NPSC when requesting a stay, the FCC's declaratory ruling effectively resolved the legal issues presented in this appeal. In accordance with that ruling and other authorities cited in this opinion, therefore,

IT IS ORDERED that the NPSC's arbitration order is reversed and the case is remanded to the NPSC with directions to provide for the implementation of an interconnection agreement between Sprint and SENTCO that will define the terms "end user" (or "end use customer") and "reciprocal compensation" in the manner that was proposed by Sprint. A final judgment to this effect shall be entered by separate document.

September 7, 2007.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge